# C·ASES

# SUPREME JUDICIAL COURT,

## COUNTY OF WASHINGTON & AROOSTOOK,

### ARGUED AT JULY TERM, 1842.

## WILLIAM F. W. OWEN *versus* JAMES BOYLE.

By the laws of the Province of New Brunswick, being in that respect the same as in England, a common warehouse, in the sense in which the word is used in relation to distress for rent in arrear, is a building, or an apartment in one, used and appropriated by the occupant, not for the deposit and safe keeping or selling of his own goods, but for the purpose of storing the goods of others, placed there in the regular course of commercial dealing and trade, to be again removed or reshipped.

Where a quantity of his own salt was deposited in a warehouse of this description, within that Province, by a person other than the occupant thereof, in the regular course of trade, the duties being paid, to be stored and again removed or reshipped, *it was held*, that such salt was not liable in law to be taken by a warrant of distress for rent in arrear, due from the lessee of such warehouse to the owner thereof.

And if the salt of such depositor, not being liable therefor, should be taken by the landlord on a warrant of distress and sold for the payment of rent due from the tenant, and purchased by the landlord, the course of proceedings in the sale being in conformity to the laws of the Province, such sale would not have the effect so to transfer the property in the salt to the landlord, as to enable him to maintain replevin therefor against the depositor thereof.

In an action of replevin for the salt, brought after the sale, by the landlord against the person so depositing it in the warehouse, the tenant is a competent witness for the defendant.

THIS was an action of replevin for 600 bushels of salt, and the question was, whether the property of the salt when replevied, was in the plaintiff. For eight or ten years before

Owen *v.* Boyle.

the trial the plaintiff had been and then was owner of the island of Campo-bello, in the province of New Brunswick, on which island he resided. For many years prior to and on the 22d of September, 1835, William McLane was the tenant under the plaintiff of a wharf and store on said island. On the above named day the plaintiff distrained the said salt, which was then in that store, for rent, due on said lease to him from McLane, which salt was then the property of the defendant. The same not having been replevied by the said Boyle, was sold at auction and purchased by the plaintiff. Prior to such sale and after the distraint was made, the directions of the act of said province, c. 21, § 4, were complied with. The salt remained in the store till the spring of 1836, at which time the defendant, without the permission or knowledge of the plaintiff, took and removed the salt to a store at Lubec in this county, entered the same at the custom house, and paid the duties, immediately after which the plaintiff replevied the salt. At the trial, before SHEPLEY J. at the July Term, 1840, one ground of objection against the right of the plaintiff to distrain the salt, was, that the same was so distrained in the said store where the same had been deposited on storage by the defendant, with the consent of said McLane, after he had brought the same from St. John for the purpose of exportation; and that the said store was at the time a common warehouse for the deposit of goods on storage paid to said McLane. Evidence to prove the above facts was produced on the trial.

The defendant offered in evidence the deposition of the said McLane, to the admission of which the plaintiff objected; and being inquired of by the Court for what reason, answered, because he was the party whose property was distrained. The Judge remarked, if there was no other reason, it must be admitted; and it was admitted.

The counsel for the plaintiff contended, that inasmuch as the defendant, after the salt was distrained, and he had immediate notice of it, did not commence an action of replevin of the same, in the manner pointed out in the annexed copy

of the statute of the province, and thereby stop all further proceedings as to the distress, but lay by and permitted the whole of the same to be sold at auction, that therefore by such sale the defendant's property in said salt was divested, and the same was vested in the purchaser, whether the same salt was liable or not liable to be distrained; and that the proper and only remedy of the defendant was an action of trespass, or trover, against the landlord, in which damages would be recovered equal to the injury sustained by means of the distress and sale, if the plaintiff had no legal right to distrain the salt.

Alfred L. Street, a counsellor at law in the Province of New Brunswick, testified that the course of proceedings in distress for rent is the same in England and New Brunswick, except and so far as it is altered by the Provincial statute ; and that the common-law of England in relation to distress for rent is in force in the province of New Brunswick.

The Judge instructed the jury, on the point here presented, that a common warehouse, in the sense used in the law relating to this matter, was a building, or an apartment in one, used and appropriated by the occupant not for the deposit, safe keeping or selling of his own goods, but for the purpose of storing the goods of others, placed there in the regular course of commercial dealing and trade, to be again removed or re-shipped ; and that if they should find from the testimony, that the building or apartment in which the salt was seized, had acquired the character of a warehouse in the sense stated, and that the salt was the property of the defendant, and had been there placed by him in the regular course of trade, the duties being paid, to be stored and again removed or re-shipped, it was not liable in law to be taken by a warrant of distress for rent in arrear, due from the lessee of that building, and that the proceedings in New Brunswick, if regular, would not under such circumstances have the effect to transfer the property in the salt to the plaintiff.

The verdict for the defendant was to be set aside and a new trial granted, if these rulings and instructions were erroneous.

Owen v. Boyle.

The following were proved to be true extracts from " The Acts of the General Assembly of Her Majesty's Province of New Brunswick."

" CHAP. XXI.

" An Act to regulate the proceedings in actions of replevin, and to enable the sale of goods distrained for rent, in case the rent be not paid in a reasonable time, and for the more effectual securing the payment of rents and preventing fraud by tenants. Passed the 14th March, 1810.

" IV. *And be it further enacted,* That when any goods and chattels shall be distrained for any rent reserved and due upon any demise, lease, or contract, whatsoever, and the tenant or owner of the goods so distrained, shall not within five days next after such distress taken and notice thereof (with the cause of such taking) left at the dwellinghouse or other most notorious place on the premises, charged with the rent distrained for, replevy the same, with sufficient security to be given to the sheriff, according to law, that then in such case, after such distress and notice as aforesaid, and expiration of the said five days, the persons distraining shall and may, with the sheriff, or under sheriff of the county, or with a constable of the parish, city or place where such distress shall be taken (who are hereby required to be aiding or assisting therein) cause the goods and chattels so distrained, to be appraised by two sworn appraisers (whom such sheriff, under sheriff or constable are hereby empowered to swear) to appraise the same truly according to the best of their understandings; and after such appraisement shall and may lawfully sell the goods and chattels so distrained, for the best price that can be gotten for the same, towards satisfaction for the rent for which the said goods and chattels shall be distrained, and of the charges of such distress, appraisement and sale, leaving the overplus, if any, in the hands of the said sheriff, under sheriff, or constable for the owner's use."

At the term at which the trial took place, it was agreed that the case should be argued in writing; and arguments were afterwards sent to the Court.

*Mellen* and *S. S. Rawson,* for the plaintiff.

The first ground of our motion for a new trial, is the admission of the deposition of William McLane, on the application of the defendant, though objected to by the plaintiff. Before the objection had been made, we had introduced proof that McLane had, for several years been the tenant of Owen, and that the salt had been distrained by him for rent, in the store, being part of the leased premises; and that the salt, when distrained, was the property of said Boyle. On this ground our objection, on account of McLane's interest, was placed. His interest is this; Boyle's salt was, on the leased premises, distrained and sold for payment of rent due from McLane to Owen; and the question, then depending before the Court, was, whether the same was lawfully distrained and sold; for, if so, then Boyle had thereby, in effect and legal contemplation, paid a sum of money for McLane; he had paid his debt, or a part of it to Owen; and, in consequence, had a legal right of action against McLane to obtain a reimbursement of it. It was therefore for McLane's interest to defeat the present action, and, by so doing, to relieve himself from all liability to Boyle, if he could by his testimony establish facts, shewing that the salt was illegally distrained and sold. *Skillinger* v. *McCann,* 6 Greenl. 364.

The second ground of our motion for a new trial has respect to the instructions of the presiding Judge, as to the effect of the sale of the salt, after it had been distrained, and the proceedings, prior thereto, had taken place, in relation to it. It is familiar law that certain goods are not liable to distress for rent; as goods of a stranger, though found on the leased premises, when there are sufficient goods of the tenant, which may be legally distrained. So also goods which are protected, as being stored in a common warehouse or in the possession of persons to be wrought in various ways which need not be here mentioned. So also certain beasts and articles in use, &c. And no articles can be distrained by a landlord, when no rent is due. In all these cases the law furnishes an appropriate remedy to any person, whose rights or property may be invaded

in any of the before mentioned circumstances.  This principle no one can violate with impunity.  But it is equally true that it is the province, and in the power of the legislature, to prescribe any constitutional and lawful mode in which a person injured in his property, shall seek redress, either in procuring a restoration of the specific property, or damages for the injury he may sustain by an illegal disposition of it.  Of these provisions there is a vast variety in all governments.  In *Gedney* v. *Inhab. of Tewksbury*, 3 Mass. R. 307, and *Smith* v. *Drew*, 5 Mass. R. 514, the Court say, "When a statute gives a *right* and furnishes the *remedy*, that remedy must be pursued." We may add that when the remedy, as prescribed, is to be employed under certain limitations, as to time or circumstances, it must be sought and enjoyed accordingly.

We will first examine the cause merely by the language of the section of the Provincial statute, and its plain provisions, conditions and directions.  The whole statute is, from its nature, a general one; applicable to *all* distresses for rent.  In the first part of the section we meet with this idea.  The language is, "if the *tenant* or *owner* shall not within five days next after such distress taken and notice thereof, &c. &c. *replevy* the same, with sufficient surety given, &c. &c." then the goods shall and may be sold at auction.  The use of the words "*tenant* or *owner*," shows that the legislature had in view property distrained belonging either to the *tenant* or some *other owner;* yet the same provision as to the *replevin* is applicable equally to both; and in the present case there was no replevin to stay the statute proceedings, terminating in a sale of the distress.  What reason had Owen to suppose that Boyle would ever assert any claim to the salt?  By omitting, after notice, to replevy the salt, he impliedly assented to a sale, relying on a future remedy for his damages.  What course could Owen pursue?  If he had abandoned the salt and proceeded no further and no sale had been made he would have been liable to an action for damages, as was expressly decided in the case of *Smith* v. *Goodwin*, 2 Neville & Manning, 114.  Besides, he had no other mode of obtaining the expense of the distress,

notice and appraisement, as provided for in the fourth section. He followed the plain directions of the statute from the beginning to the end, as to the course of proceeding with the distress. This leads to the inquiry, "what is the effect of a lawful sale of a chattel? There is but one plain answer to this question. It *divests* the property of the *owner* and *vests* it in the *purchaser*. A legal sale surely is not a *nullity*. Can such a sale be condemned as such, and the purchaser lose the purchase money? The question is a *general* one; not merely applying to this case.

The Judge instructed the jury, that if the salt, when it was distrained, had been the property of McLane, the *tenant*, instead of Boyle, inasmuch as the sale was not prevented by a replevin, such sale would have transferred the property to the purchaser, *though the same was not liable to distress*. The fourth section recognizes no such distinction; but excludes it; the section is general, and embraces all kinds of distresses, without considering whether they are lawfully made or not; the question as to the *lawfulness* of it is to be decided in an action of *replevin*, if the owner prefers *that* mode; or, he may let the distrainor proceed and sell the distress, and seek recompense of the landlord in an action of trespass or trover and recover damages, if the distress was unlawful. Again, what good or plausible reason can be assigned why a distress and sale at auction of goods belonging to the *tenant*, though not liable to distress, should convey a good title to the purchaser, and yet that such a seizure and auction sale should convey no title, if the property belonged to *any one else*, or if the distress was made when *no rent was due?*

Chancellor Kent seems to recognize no such distinction as that which we have been considering. In volume 3d, page 476, he says, "when rent is due and unpaid, the landlord, on demand, may enter immediately, by himself or his agent, upon the demised premises and distrain any goods and chattels that are to be found there belonging to the tenant or others." He then mentions certain articles not liable to distress; and, on page 180, proceeds thus, "after the distress has been duly

made, if the goods are not replevied within, &c. after notice, the goods shall be appraised and sold at public auction." Judge Blackstone, volume 3d, page 13, when speaking of goods which have been distrained, says, that they " must remain impounded till the owner makes satisfaction or contests the right of distraining by replevying the chattels; a replevin answers the same end to the distrainor, as the distress itself; since the party replevying gives security to return it if the right be determined against him."

By the language of the provincial statute, the right of preventing a sale of the salt and the effects of such a sale, was granted to Boyle *conditionally ;* and the condition was a *precedent* one ; and it was *not* complied with. Our argument proceeds on the principle of perfect respect for the rights of all parties, and a perfect protection of the rights of Boyle ; but, by his own election and conduct, that protection must be enjoyed in the form of *damages,* if any rights have been violated. He has *waived* his right, if he has any, to all other protection and remedy.

Very numerous cases in the English reports support the position for which we are now contending. *Francis* v. *Wyatt,* 3 Burr. R. 1498; *Parry* v. *House,* 1 Holt, 498; *Bradbury* v. *Wright,* 2 Doug. 624; *Newman* v. *Aderton,* 2 New. R. 224; *Braddytt* v. *Jones,* 4 Doug. 52 ; *Fenton* v. *Logan,* Bing. 676 ; *Read* v. *Burley,* Cro. Eliz. 596 ; *Davis* v. *Gyde,* 2 Adol. and Ellis, 623 ; *Walker* v. *Rumbald,* 12 Mod. 76 ; *Davies* v. *Powell,* Willes's R. 46 ; *Moss* v. *Gallamore,* 1 Doug. 279 ; *Brown* v. *Shevilt,* 2 Adol. and Ellis, 138; *Gilman* v. *Eaton,* 3 Brod. & Bing. 75 ; *Thompson* v. *Mashita,* 1 Bing. 283 ; *Shepherd* v. *Case,* 5 Car. & P. 418; *Tenner* v. *Yolland,* 2 Chitty's R. 167. The prescribing course of proceeding and series of decisions in this class of actions prove how the principles and practice of law are established and understood in the English courts, and which are similar in the province of New Brunswick; and we also further believe that they are applied to all cases of distress whatever, for rent due, and sale of the distress without distinction ; whether the property distrained was

liable to distress or not; or whether it belonged to the *tenant* or *another owner.* Bradley, in his treatise on Distress, neither makes, nor alludes to any distinction between the above cases; but on page 228, after prescribing the forms respecting the appraisement of the goods and the oath of the appraisers, adds, " the next thing is to search the sheriff's office to see if the goods have been *replevied;* and if they have not, and the rent and charges are still unpaid, then to *sell the goods,* after they have been appraised."

We will now present to the consideration of the Court three more cases, which we presume are decided on principles which completely show that we are entitled to a new trial on the merits of the cause. *Simpson* v. *Hartopp,* Willes's R. 512; *Gorton* v. *Faulkner,* 4 T. R. 564; *Matthias* v. *Mesnard,* 2 Car. & P. 353.

The same principle was sanctioned in *each* of the last three cases, though in *Gorton & al.* v. *Faulkner,* the verdict was for the defendant. In each of the other two the property distrained was not liable to distress when taken, and did not belong to the tenant who was indebted for the rent. In those two cases the facts exactly resemble those in the case of *Owen* v. *Boyle;* the property distrained was not liable to distress and did not belong to the tenant. The same judgment would have been given in the case of *Gorton & al.* v. *Faulkner,* had the property been in *actual use* when it was distrained. So that the *whole Court,* in the case of *Simpson* v. *Hartopp,* and Best C. J. in *Matthias* v. *Mesnard, concur* as to the law; and the approving opinion of the learned Judge Buller gives additional weight to the decision in *Simpson* v. *Hartopp;* as stated by him in *Gorton & al.* v. *Faulkner.*

In the most careful examination which we have been able to make, not a single case or sentence has been found, in which an auction sale of a distress has been a question, or the validity of a title, under such a sale, doubted. On the contrary, the verdicts in cases of trespass and trover are evidently intended as a compensation for the goods distrained and sold, when on trial it appeared that the distress was unlawful. " When a

distress and sale for rent are made when *no rent is due*, the owner may recover of the distrainor *double* the value of the goods distrained and sold with full costs." Comyn, Distress, D. 9. The probable reason is, that he *must have known* that he was acting unlawfully; but in *other* cases *single* damages only are recoverable.

We conclude this long argument with respectfully observing that in the present case the powers of the Court are more limited than they are in those cases where they are examining the construction of the statutes of this State, or the correctness of the construction which may have been given to them, or the manner in which the principles of the common law have been applied in certain cases, which are the subject of re-examination. In forming their decisions, when *thus* sitting in judgment, the whole province of judicial investigation is opened to our Courts, so far as our laws prescribe rules of action, and subject principles to the government of their sound and legal judgment and final decision. But in the case now before the Court, permit us to inquire, what is the *legal discretion* of the Court, and what are its legitimate boundaries? If the plaintiff ever acquired any title to the salt in question, he acquired it under the law of New Brunswick, *as administered or executed* by the officers of the government of that province; and it seems to be merely a *question of fact* what *that law is.* We apprehend that our Courts have no power to revise the decisions made in any foreign court, or give any construction of an English or provincial statute different from that which the Courts of England or New Brunswick have given; or adopt a course of proceeding, in carrying into execution their statutory provisions, different from that which has been adopted there; or give *less* effect to a sale of a distress, according to the act of New Brunswick, in *one* case, than in *another*, where, by the course of proceedings and practice in that province, no such distinction appears in the reports relative to this class of cases. As we have no such system in this State as the summary process of distress for rent, it is most respectfully submitted to the Court whether a safer course can be pursued in such

a case as the present, than to follow in the footsteps of those whose province it was to execute the laws, by which the plaintiff, on appealing to them, became the purchaser of the property demanded in this action.

We apprehend that, from our examination and argument, the following conclusions are legitimately drawn and firmly established.

1. That certain property may be *legally* distrained for rent; and that certain property *cannot* be *legally* distrained for such purpose.

2. That there is but *one* provision in the province statute which points out the course to be pursued by the person distraining, as to notice, inventory, appraisement and sale of the property distrained, *when it is not replevied.*

3. That the right to replevy distrained property, whether the distress is lawful or unlawful, exists in all cases, whether exercised or not, in the manner provided by the statute.

4. When such right of replevying the property, is not exercised, and a sale thereof prevented, such sale, made according to the provisions of the statute, transfers the property to the purchaser.

5. And that the construction of said section of the statute *by*, and the proceedings thereon *in* the English Courts, furnish evidence of the correctness of the four preceding conclusions.

*Hobbs*, for the defendant.

The counsel for the defendant proposes to do no more than submit the following heads of an argument.

First. The deposition of McLane was properly admitted:

1. The objection taken by the plaintiff's counsel was not warranted by the facts in the case. The property taken was not McLane's.

2. At the former trial McLane's deposition was objected to generally, on the ground of interest, and the defendant shewed that he was released by him before testifying, and the deposition was thereupon read. The limited character of the objection taken at the last trial rendered it unnecessary to shew a release.

3. But assuming that McLane was interested, and was not released, his interest was a balanced one. If the plaintiff prevails, the witness must account with the defendant for the value of the salt. If the defendant prevails he must pay the rent.

Second. The plaintiff's counsel assume, that the legal effect of the statute proceedings in the Province of New Brunswick, in reference to the salt, was to divest the property of the owner, the defendant, and to vest it in the purchaser, the plaintiff. This position is denied :

1. It is not supported by the numerous cases cited and commented upon by plaintiff's counsel. They go to shew the particular remedy each party sought, for a violation of his right of property in those cases. They by no means establish the proposition contended for, that replevin, trespass or trover against the *landlord or his servants* is the *only* remedy a party has for an injury to his property in distraint for rent. The legal effect of a sale on distress for rent, where the property distrained belonged to a third person, was not raised or considered in any one of them. Nor is it fairly deducible from all the cases cited. They merely show what property is, and what is not, the subject of distress in England, and consequently in the Province of New Brunswick ; and they establish conclusively, what this Court has already decided, that the salt in controversy was not, under the circumstances, liable to that process.

2. The position taken by the plaintiff's counsel is against a fundamental principle of the British constitution. It goes to deprive the subject of his property without judgment of law. 4 Bl. Com. 425 ; 29 ch. Magna Charta.

A judgment of law without notice will not bind the debtor nor his property. *Buchanan* v. *Rucker*, 9 East's R. and cases cited in notes; *Sawyer* v. *M. F. & M. Ins. Co.* 12 Mass. R. 291 ; *Bradstreet* v. *Neptune Ins. Co.* 3 Sumner, 600.

Much less will it bind the property of a third person not a party to the suit.

If the principle contended for is correct, then a judgment creditor may levy his execution on the property of a stranger,

and make a good title to the purchaser. This is against the first princples of natural justice.

But it is said that the statute of New Brunswick has created a right, and given a remedy for its violation, which alone can be pursued. If the statute has created the right to take the property of a subject without judgment of law, or without his consent, and without compensation, it is unconstitutional.

But the Act in question creates no such right, and confers no such power. It merely regulates proceedings, between the parties, in case of distraint for rent. It gives the tenant, or owner of the property distrained, a choice of remedies, a right to replevy the distress within a limited time, or, abandoning the specific chattel, to go for damages. It is silent as against whom he may bring his action. It does not say, that he shall not have his remedy against the vendee. The cases cited by the plaintiff's counsel show that he may have his action against the landlord or his servants. Upon principle the vendee also is liable.

3. It is against the authority of decided cases. The purchaser acquires no title to property which he buys at a sheriff's sale unless it belongs to the judgment debtor.

Yelverton's Reports, 180, (a) in the notes, where are cited: *Cooper* v. *Chitty*, 1 Burr. 20 ; *Shaw* v. *Tunbridge*, 2 Bl. R. 1064 ; *Sheric* v. *Huber*, 6 Binney, 2 ; *Stone* v. *Ebberley*, 1 Bay, 317 ; *Pettingell* v. *Bartlett*, 1 N. H. R. 87.

In *Cooper* v. *Chitty*, (which was the case of the assignees of a bankrupt against the sheriffs of London for taking the goods of the bankrupt after the act of bankruptcy and before the assignment, and a sale after the assignment,) the counsel for the plaintiff contended that the action could be maintained either against the plaintiff in the cause, the sheriff, *or the vendee of the goods*. This principle was not controverted by the defendants' counsel, and Lord Mansfield, in delivering the opinion of the Court, says, "It is admitted on the part of the defendants *that an innocent vendee of goods so seized can have no title under the sale but is liable to an action*." Again, in remarking upon the

cases cited for the defendants, he says, "None of these cases authorize the sheriff to sell the goods of a *third person*, and it is admitted *the vendee* is not protected here because at the time of the sale the sheriff had no authority to sell."

4. But the plaintiff, in the present case, is both vendee and landlord. The case finds that he was affected with notice of the defendant's rights. He knew, or is presumed to have known, all the facts which made the distraint unlawful; to wit, that the salt was the property of the defendant, that it was placed in McLane's warehouse on storage and for exportation, and was, therefore, not liable to be distrained for rent.

It is an attempt on his part to avail himself of proceedings *inter alios* under a statute of the Province to deprive the defendant of his right of property without judgment of law; which this Court will not sanction.

The opinion of a majority of the Court, WHITMAN C. J. dissenting, and giving his reasons, was drawn up, and delivered, at the July Term in this county, 1843, by

TENNEY J. — The building or apartment, where the salt was stored, was used and appropriated by the occupant, not for the deposit and safe keeping or selling of his own goods, but for the purpose of storing the goods of others, placed there in the regular course of commercial dealing and trade, to be again removed or re-shipped, and the building or apartment had acquired the character of a warehouse, and the salt was the property of the defendant, and had been there placed by him, in the regular course of trade, the duties being paid, to be stored and again removed or re-shipped. The questions now presented for consideration and decision are : —

First. Was the salt thus situated liable to be distrained or taken for the rent, due to the landlord from the tenant, of the premises, where it was deposited? and if not : —

Second. Did the proceedings, being regular, in New Brunswick, have the effect to transfer the property in the salt to the plaintiff? And Third. Was the tenant of the premises a competent witness for the defendant?

Owen *v.* Boyle.

The case finds, that the course of proceedings in distress for rent in England and New Brunswick are the same, except so far as it is altered in the latter by the Provincial statute; and that the common law of England in relation to the subject, is in force in the Province of New Brunswick. The two first questions must be settled by the statute of that Province, and the common law of England, and in determining whether the salt was subject to be taken in distress for arrears of rent we look to the latter exclusively, as the statute does not undertake to point out what goods are liable and what exempt, but only prescribes the mode of proceeding. Whatever may be the law in other places, this case is not to be affected thereby. We are not at liberty to adopt any principles established elsewhere, however reasonable they may appear, in violation of the settled law of New Brunswick. But in the absence of authority giving a construction to that statute, or to the law relating to the subject generally, we may be materially aided by the reasoning and opinions of other Courts, in giving a construction to a similar statute.

The salt was indisputably that of the defendant, when it was taken in distress; and if it was subject thereto, the title passed to the plaintiff. It is well settled in England, that whatever goods and chattels the landlord finds upon the premises, whether they in fact belong to a tenant or a stranger, are distrainable by him for rent. But to this rule are exceptions, and certain articles are exempted from distress, not only belonging to strangers, but to the tenant himself. Animals *ferae natura* cannot be distrained. Whatever is in the personal use and occupation of any man is for the time privileged and protected from any distress. Valuable things in the way of trade shall not be liable to distress. As a horse standing at a smith's shop, to be shod, or in a common inn; or cloth at a tailor's house; or corn sent to a mill or market. For all these are protected and privileged for the *benefit of trade ;* and are supposed in common presumption not to belong to the owner of the house, but to his customers. 3 Bl. Com. 8.

In *Gisbourne* v. *Hurst*, 1 Salk. 250, it was agreed by the Court " that, goods delivered to any person exercising a public trade or employment, to be carried, wrought, or managed in the way of his trade or employment, are for that time under legal protection and privileged from distress for rent." In *Simpson* v. *Harcourt*, Willes, 512, Lord Chief Justice Willes mentions the several classes of goods exempted for the sake of trade and commerce. " The exceptions out of the general rule are all of them tending to the benefit of trade and commerce and general advantage." Bur. 1500. In *Gilman* v. *Elton*, 3 Brod. & Bing. 75, Dallas C. J. said, " It, (the distraining chattels on the premises belonging to others than the tenant) was a rule to prevent particular species of inconvenience, which would otherwise have arisen. But as it was found, that this rule, when universally enforced, created another kind of inconvenience, extensive in its nature, exceptions were necessarily introduced. In like manner therefore, and on the same principle of public convenience, a rule has been adopted in favor of trade and commerce." And again, " The Court is bound to consider the rule of public convenience as applicable to trade and commerce." " It seems to me, that all the decided cases are consistent with public advantage, and that it would be at once detrimental to the public and inconsistent with the cases, if we were to hold, that goods in the custody of a factor are liable to seizure." " The nature of the exception on the score of necessity or public convenience is laid down by Blackstone, in the argument of *Francis* v. *Wyatt*," 1 W. Bl. 484. " It is where it would be quite impracticable or highly incommodious to dispose of and manufacture the goods at home." And again it is said, " as to the case of *Francis* v. *Wyatt*, (where all the analogies are in favor of the exemption of goods in the hands of a factor, and there is no decided case at variance with such a position) it seems to me important, that the assertion in argument touching the exemption of such goods was not controverted by the opposing counsel or by the Court itself." And goods sent to a wharf or market and holden within the exception on grounds of pub-

lic convenience. It is settled, that goods in the hands of a factor have been held privileged from distress, and it is not a favor shown to the factor as an individual, it is to the trade. And in the same case, Park J. says, "though the general rule be old, the exceptions themselves are as old. The instances mentioned under the exception as to trade, in Lord Coke, are not put as limiting or comprehending the whole exception, but merely by way of illustration. The principle of the exception is admirably put together by Lord Holt, in Salkeld, 250, and his language shows that the exception was not established for the benefit of the individual, but of trade in general; he extends it to goods to be carried, wrought, or managed; and are not goods placed in the hands of a factor to be managed? The case of *Rede* v. *Burley*, Cro. Eliz. 596, is also strong to show, that it is the trade which is favored, and not the individual." And Burrough J. remarks, "from the earliest times, these exceptions to the general right of the landlord to distrain have existed;" he says, "no one can read the case of *Francis* v. *Wyatt*, in Burrow, without seeing that the case of a factor falls within the principles there laid down." "But commerce in general and the business of London and the country could not be carried on without it." Richardson J. says in the same case, "The advancement of trade equally requires that goods should be placed in the hands of a factor for sale, as that they should be placed in the hands of a carrier for carriage;" "it would be highly injurious to trade, if goods sent for sale, were liable to be distrained for the private debt of the factor."

The case of *Thompson* v. *Mashiter*, 1 Bing. 283, was where the plaintiff consigned to one Cleasely as a factor or agent, whalebone for sale. The whalebone was landed at Ramsay's wharf, a public waterside wharf, and was afterwards placed in Ramsay's warehouse over the wharf for safe custody. The whalebone was afterwards taken from the management of Cleasely, and placed by the plaintiff under the management of Devereux & Lambert, for sale, as the brokers and factors of the plaintiff, and it was transferred from the name of Cleasely to

Devereux & Lambert. Ramsay became insolvent, and the whalebone was taken in distress for arrears of rent due from Ramsay, and it was held privileged. Dallas C. J. says, "so the case is the same as if the owner had sent them immediately to Ramsay's where, on the broad principles of public convenience, I think they were not liable to distress;" and in express terms rejects the idea of a distinction between goods sent to a factor or directly sent to a warehouse. And Park J. holds, that certain exceptions of goods from distresses were permitted, not on account of the character of the individual in whose hands they are deposited, but for the benefit of trade. "On that general ground we now decide and not on the ground, that Ramsay was the servant and stood in the place of the factor." Burrough J. said, "these goods were brought to the wharf in the course of trade, and ought therefore to be protected."

The same doctrine is fully recognized by the Court of King's Bench, in the case of *Brown* v. *Shevill*, 2 Adol. & Ellis, 138, and the authority of the cases before cited fully confirmed.

*Matthias* v. *Mesnard*, 2 Car. & Payne, 353, was where the plaintiff was a corn merchant, and the defendant landlord of the premises occupied by Ryland & Knight, lightermen and granary keepers to Ryland & Son, who were the plaintiff's factors. Ryland & Son having no warehouse of their own, deposited the corn sent them by the plaintiff for sale, in the warehouse of Ryland & Knight, from whom rent was due to the defendant, and for it distress was made of the corn lying on the premises, and this action, brought for the corn, was sustained. Best C. J. is reported to have said, "I am of opinion there is no substantial difference of a factor's warehouse, and the warehouse of another, which the factor uses. And again, a landlord has by the general law, a right to take any property found upon the premises of his tenant. But many years ago in favor of trade, exceptions were made, as in the case of delivery of cloth to a tailor, and in many other cases. A landlord must know he cannot take the corn of other parties, and

therefore if his tenants are granary keepers, he can take other security for his rent. What foreigner or what person living in the country would send articles to a granary keeper, if they were to be put in danger in this way? It seems to me, I should be breaking in upon a principle, almost essential to the existence of trade, if I were to hold that this plaintiff was not entitled to recover." *Adams* v. *Grave*, 3 Tyrwh. 326.

Chancellor Kent, Vol. 3, 477, is equally clear, and adopts the doctrine deducible from the English cases. "A horse at a public inn, or sent to a livery stable to be taken care of, or corn at a mill, or cloth at a tailor's shop, or a grazier's cattle put upon the land for a night or on the way to market, or goods deposited in a warehouse for sale or on storage in the way of trade, or goods of a principal in the hands of a factor, are not distrainable for rent." *Brown* v. *Sims*, 17 S. & R. 138.

The doctrine of these cases is, that goods and chattels temporarily in the hands of others, for the purpose of being, "carried, wrought or managed," are privileged from distress for rent. This is a protection to the articles thus situated and not intended in the least as a special favor to those in whose charge they are left. An innkeeper, common carrier or tradesman are no more entitled to advantages, than those otherwise employed. But if property falling under their care, was not thus guarded by the laws, the business of certain mechanical trades would be entirely arrested, carriage of goods would be confined to their owners themselves, and vast commercial dealings would be essentially impeded in their progress. The agencies, which commercial enterprise render necessary, would in a measure cease to exist, on account of the hazard which would attend their operations.

No precise rules are given, by which to determine in all cases the line, which divides the property privileged, from that which is liable. But when we keep in view, the great object of the exception, can there be any doubt, what the general rule was intended to be? And the difficulty of application will arise, from the want of a distinct character of a given

case, rather than from any uncertainty in the rule of exemption.

If the exceptions are to favor trade and commercial dealing in general, and not to protect any particular employment, will they not embrace the management of goods in their progress to a market? If, when they are delivered to a common carrier to be carried, or to a mechanic to be wrought, they are free from distress, can it be said with any regard for the reason of exemptions, as stated by the English Judges from the time of Lord Holt to the present day, that goods deposited in a warehouse or on a wharf, for safe keeping, to be again removed in the regular course of trade, are liable to seizure for arrears of rent due from the tenant of the premises, where they are deposited? What species of goods could be more a proper subject of protection in a country like England, whose pride, whose wealth, whose strength and whose fame have arisen and are continued by the liberality and far-sightedness of their mercantile regulations, than that which is brought into their ports, entered at their custom houses, the duties for the support of the government being paid, and deposited in a warehouse, like the one used by the defendant, for security, till a satisfactory sale can be made? In the language of C. J. Gibson, in the case of *Brown* v. *Sims*, "where the course of business must necessarily put the tenant in the possession of the property of his customers, it would be against the plainest dictates of honesty and conscience to permit the landlord to use him as a decoy, and pounce upon whatever should be brought within his grasp, after having received the price of its exemption in the enhanced value of the rent."

The salt we think was exempted from distress, and the plaintiff was guilty of a legal wrong, in causing it to be taken. But it is insisted in the second place, by the plaintiff's counsel, that the defendant having omitted to bring his action of replevin previous to the sale of the salt, he is now precluded by his own neglect to resort to that remedy; and that by the 4th section of the Provincial Act referred to in the report and by the laws of England, the defendant is divested of the property,

and it is that of the plaintiff. Cases have been cited and relied upon to show, that when replevin has been brought, it has been before a sale of the distress, and within the time expressly given by the statute and the law of England ; and if that time had expired, the right to distrain was determined in actions of trover or trespass. No cases have been referred to precisely similar to the one at bar, and none of those cited for the plaintiff were actions in which it appeared that the purchaser of the distress was called upon; but they were against the landlord, who caused it to be made. Here the landlord and the purchaser are the same.

The defendant in this case, finding his property after the sale, in a warehouse, where he had originally stored it in the regular course of trade, instead of replevying it, took and removed it into the United States without any judicial process. This he was authorized to do, if he was at the time the lawful proprietor, and his defence in the present suit must be determined by the same principles, which would sustain an action of replevin in his favor, if he had resorted to that to recover possession of the goods in controversy. The maintenance of such an action must be upon the ground, that the salt was his, and there can be no doubt that one may retain possession of his own property, though that possession was acquired without process.

From the result to which we come on the first question, that the salt was privileged from distress, it follows that the plaintiff was guilty of a violation of law in causing it to be taken. This is not denied by his counsel, but expressly admitted, provided the distress was unauthorized ; and indeed the authorities adduced by them are all upon the truth of such a proposition.

It is established doctrine in England, that replevin will lie generally for a wrongful taking, and when trespass could be maintained. And in fact, aside from the statutes in England and the Province of New Brunswick, authorizing the action of replevin by the tenant against the landlord for property taken in distress, it is not perceived that such action could be

maintained.   Where property is taken in execution, the debtor therein cannot ordinarily maintain this action, but strangers, who are owners, may do it.

In looking at the history of the law applicable to the sub- ject of distresses for rent, we find, that this and other provisions were intended to favor the tenant, to preserve his rights and not to limit them ; and at the same time to indemnify the land- lord; and the act under which the plaintiff professes to de- rive his title, gives the tenant or owner of the property this remedy against the landlord, leaving the law in other respects unaffected thereby.   "The exorbitant authority and import- ance of the feudal aristocracy and the extreme dependence and even vassalage of the tenants, was the occasion of intro- ducing the law of distresses ; for the non-payment of rent was a forfeiture of the feud, and the landlord could enter and assume it.   The right of distress was given, that the landlord could seize a pledge in order to obtain justice, and he could take and detain cattle and other moveables found upon the land until the damages were paid.   This was found to be as distressing to the tenant, as the feudal forfeiture, and was an engine of oppression.   Then followed the statutory provision of 51 Henry III, that when beasts were taken in distress, the owner might feed them without disturbance, and that a sale should not take place, till the expiration of fifteen days.   All these did not prevent the abuses practised by landlords, which were found to be intolerable in their refusal to permit the king's courts to take cognizance of the distresses, made at their own pleasure, and therefore, as Sir Edw. Coke observes, they as- sumed to be judges of their own causes, contrary to the solid maxim of the common law; and in the 52 Henry III, the statute of Marlebridge was passed, providing if the tenant was disposed to controvert the legality of the distress, either by denying the rent due, or averring it to be paid, the law pro- vided him with a remedy by a writ of replevin." 3 Kent's Com. 2nd Ed. 473, 474, 475, and 476.   And in 3 Bl. Com. 13, it is said, "as a distress is at common law only in the nature of security for the rent or damages done, as replevin answers

the same end to the distrainor as the distress itself, since the party replevying gives security to return the distress if the right be determined against him." And by the settled doctrines of the English Courts, the remedies which previously existed to secure subjects in the possession and enjoyment of property not liable to distress were in nowise diminished by the provisions intended to protect tenants in the unreasonable exercise of the power of their landlords. Titles to property in dispute were left to be settled in the same manner as before. We have seen no authority, which forbids to third persons an adoption of those means of indemnity which they could have before resorted to. And the statute of New Brunswick has given to landlords in this respect, no more power over the property of those, who may have left it on the lessee's premises, than was and is possessed by landlords in England.

Gilbert calls the writ of replevin at common law a *judicial* writ, intended as a speedy remedy ; and he says, "replevin lies for goods in which the plaintiff has a qualified as well as an absolute property ; as if goods were in my hands to be delivered to J. S. and J. N. takes them, I may have replevin to recover possession, because I have a right of possession against every body but J. S. and J. N. is therefore a trespasser." Gilb. on Distress & Replevin, 3d Ed. 87 ; Com. Dig. Replevin, a. " Replevin lies of all goods and chattels unlawfully taken." 6 Com. Dig. 224, Replevin, a.

In 18 Viner's Abr. 577, Replevin, B. F. 2, F. 3, it is said, "If a trespasser take beasts, replevin lies for this taking at election," and Bro. in replevin, pl. 37 — 39, cites 2 Edward IV, 16, " for the owner may affirm property in himself by bringing replevin." In *Shannon* v. *Shannon*, 1 Schoales & Lefroy, 327, Lord Redesdale says, " that the writ of replevin is founded on an unlawful taking, and is calculated to supply the place of detinue or trover."

In New York, the common law of England on the subject of distress for rent, has been adopted, and they have re-enacted the substance of the English statutes of 52 Hen. III, 3 Edw. I ; 13 Edw. I ; 21 Hen. VIII ; 17 Car. II ; 2 W. & M ; 8

Anne & 11 Geo. II, which statutes were made to control abuses, and mitigate the rigor of the common law. 3 Kent's Com. 472. And it may be useful and important to ascertain, whether their Courts have made any exception, when called upon to determine, to what cases, the action of replevin can apply. In *Pangburn* v. *Patridge*, 7 Johns. R. 140, Van Ness, in delivering the opinion of the Court says, " this action [Replevin] is usually brought to try the legality of a distress, but will lie for any unlawful taking of a chattel. Possession by the plaintiff and an unlawful taking by the defendant are the only points requisite to support the action. The old authorities are, that replevin lies for goods taken tortiously or by a trespasser, and that the party injured may have replevin or trespass at his election," and again it is said, " If this question be considered upon principle, it is proper that this action should be maintainable, wherever there is a tortious taking out of the possession of another. A great variety of cases might be stated, in which no damages, which a jury is competent to give, can compensate for the loss of a particular chattel."

In *Thompson* v. *Button*, 14 Johns. R. 84, it is clearly implied, that replevin will lie, where an action of trespass can be sustained. *Clark* v. *Skinner*, 20 Johns. R. 465, was where the plaintiff's goods were taken on an execution against John Clark, his father, who had the possession for the purpose of enabling him to do certain business for the plaintiff, and it was insisted that the goods, being in the possession of the debtor in the execution, and in the custody of the law, could not be replevied. Platt J. said, " I am of opinion, that replevin lies, in favor of any person, whose goods are taken by a trespasser ; in my judgment, the law does not deny the remedy by replevin to any person whose goods are taken from his actual or constructive possession by a wrongdoer. It is in many cases the only certain and efficacious remedy, and without it a man's personal chattels would never be safe, unless he keeps them in his own absolute custody. If I leave my watch to be repaired or my horse to be shod, and if it be taken on a fi. fa. against the watch maker or blacksmith, shall I not have re-

Owen *v.* Boyle.

plevin? If the owner put his goods on board a vessel to be transported, shall he not have his remedy, if they are taken on execution against the master of the vessel? It seems to me to be indispensable for the due protection of personal property. In many cases it would be a mockery to say to the owner, bring an action of trespass or trover against the man, who has despoiled you. Insolvency would be both a sword and shield to trespassers. Besides, there are many cases, where the possession of chattels is of more value to the owner, than the estimated value in money." And it is said again, " The rule, I believe, is without exception, wherever trespass will lie, the injured party may maintain replevin."

If goods be taken on a lawful precept, it is not in the power of him, against whom that precept is directed, to maintain replevin, excepting in cases of distress; but when a stranger to that precept, brings replevin, it is for the purpose not to examine the legality of the process on which the goods are taken, but to obtain redress for the trespass on his property. *Mills* v. *Martin*, 19 Johns. R. 31.

The act the plaintiff relies upon, authorizes the appraisement and sale of "any goods and chattels distrained for any rent reserved and due, upon any demise, lease or contract whatever, if the tenant or owner shall not within five days next after such distress taken, and notice thereof (with the cause of such taking) left at the dwellinghouse or other most notorious place on the premises, charged with the rent distrained for, replevy the same," &c. "Any goods and chattels," here referred to, must mean such as are subject to be taken in distress. It certainly could not be construed to extend to those, which had never been on the premises leased, or owned by the lessee; and where the real owner had no notice of the distress, till after the lapse of the five days or after the sale, and where he had no actual notice, and perhaps, from a distant residence, no means existed to convey any, is he precluded from the right to take his property, or from the ordinary remedy of replevin against the wrongdoer? The property here, neither belonged to the tenant, nor was it liable to be taken for arrears for rent; it was

equally protected with any other goods of the defendant, wherever situated, and can it be said they were taken or distrained within the meaning of the act? Platt J. in the case of *Clark* v. *Skinner*, referred to, in commenting upon the following language in the 6 Com. Dig. Replevin, a, viz. "though replevin does not lie for goods taken in execution," says, "this last proposition is certainly not true without important qualifications. It is untrue as to goods taken in execution, where the fi. fa. is against A. and the goods taken from the possession of B. By goods taken in execution, I understand goods rightfully taken in obedience to the writ, but if through design or mistake, the officer takes the goods, which are not the property of the defendant, in the execution, he is a trespasser, and such goods were never taken in the true sense of the rule laid down by Baron Comyns."

The action of replevin referred to, in this act, is one to be brought by the tenant or owner of the goods taken, where the *goods themselves* were liable. But if the goods were exempted, there was nothing on which the warrant could operate, and any proceedings under it could certainly confer no rights on the plaintiff, when every step was unauthorized and tortious. If goods not belonging to the tenant were lawfully taken in distress, the tenant is accountable to the owner. But if a stranger's property which is not liable, is taken, and resort is made by the owner to the tenant, it is not believed that it can prove successful; and the stranger is deprived of the ordinary indemnity, if the doctrine contended for by the plaintiff be sound.

When goods not belonging to the debtor, or in any manner subject to attachment, have been taken on execution and sold, they have not been considered as passing the property to the purchaser and giving him title. In *Skipp* v. *Harwood*, cited by Lord Mansfield in *Fox* v. *Hanbury*, 2 Cowp. 445, he is reported to have said, "If a creditor of one partner takes out execution against the partnership effects, he can only have the undivided share of his debtor, and must take it in the same

manner the debtor had it, subject to the rights of the other partner."

In *Hayden* v. *Hayden,* 1 Salk. 392, Caleman & Hayden were co-partners, and the judgment was against Caleman; and all the goods both of Caleman & Hayden were taken in execution. And it was held by Holt C. J. and the Court, that the sheriff must seize all, because the moieties are undivided, for if he seize but a moiety and sell that the other will have a right to a moiety of that moiety." *Melville* v. *Brown,* 15 Mass. R. 8. We have been directed to no authority where an innocent purchaser even of goods taken in execution has been allowed to hold them against the true owner by virtue of a sale thereon. Can it be contended that such owner would be divested of his rights, when there was nothing in reality or appearance, authorizing the seizure. If the officer has wrongfully held out title in the debtor and thereby induced persons to purchase, he is responsible for the injury to those whom he has misled; and it cannot be contended with any appearance of reason, that the purchaser has acquired title by reposing unworthy confidence, and that the innocent owner is deprived of his property and driven to a suit to obtain the value of that, which he never consented to part with. And can it with more reason be contended, that a sale of chattels, entirely privileged from distress, can pass into the hands of a purchaser, when the process is not one of judicial authority, but issued at the instance exclusively of a party interested? Such a principle would strongly tend to invite persons, to resort to such means as would take from individuals in nowise guilty of wrong or neglect, the most valuable portions of their property, without the judgment of their peers and the law of the land, and where no opportunity could be given to arrest it till recovery should be beyond their power; and for their indemnity be compelled to look to those who may be wholly irresponsible.

We have examined carefully the decisions, which give protection from distress to property in certain situations. This protection is, for reasons which apply with great force, to that which is embarked in commercial pursuits, and which the

owner is obliged to intrust to factors and agents.  This exemp-
tion is as old as the law of distresses; the proprietors of this
property from its very nature, and destination are far removed
and in no situation to exercise over it their personal control,
the law provides no means of notice to them, and shall all
these salutary provisions, which have rested on the deep foun-
dations, that centuries have not moved, be evaded, annulled by
a sale of the property, upon a process, which could not law-
fully reach it, and which originated in no judicial authority ?

But in the case at bar, the plaintiff cannot and does not
complain, that he has, in ignorance of the facts, paid the value
of the goods, for he is at the same time the landlord, who
caused the distress and the purchaser at the sale, and he is
now seeking the fruits of each.  He knew the law, and is pre-
sumed to have known, that the taking of the salt was in vio-
lation of its provisions.  He does not even contend, that his
claim is based upon any legal commencement, but insists that
a series of unauthorized acts, because they have resulted in a
purchase by him, have ripened into a perfect and indisputable
title; he does not deny his liability in another form of action
for having taken this very property, but insists that he must
retain it to remunerate him for the expense, which he has
caused, equally without legal right.  The defendant deposited
his property, where well he might.  It was then guarded by
the law, and privileged from distress.  He went after several
months, found it, as he had left it in the way of trade, entered
it at the custom house in the United States, and paid the duties,
thereby materially enhancing its value.  The plaintiff had not
previously sought the advantage of his purchase, but then fol-
lowed and took it in replevin, admitting, if he can obtain it,
thus increased in value, he must submit to compensate the
owner, for the price which it bore, when he attempted wrong-
fully to deprive him of it.  Such propositions cannot be tol-
erated unless by unquestionable authority.  They present a
case too absurd to be regarded with favor, till it is shown that
the law of New Brunswick, which we are bound not only to
respect, but which in this instance requires implicit obedience,

clearly establishes the plaintiff's title. Cases cited fail to do this, and we feel bound to yield to those principles of universal justice, in giving a construction to the act in question, which if not expressly settled in cases similar, are deducible from those which are analagous.

From the view, which we have taken on the two first ques-. tions presented, we can have no doubt, that McLane was legally admissible as a witness. Even if in the event of a failure in the defence, he should be responsible for the value of the salt to the defendant, his rent would be paid, and the interest would be balanced. But it is questionable whether he would be liable to the defendant in any event, and it would then be clearly for his interest that this cause should be so settled, that the rent should not be a charge upon him.

*Judgment on the verdict.*

WHITMAN C. J. — This is an action of replevin for a quantity of salt. The defendant was the original owner of it, and had stored it for safe keeping, in a store belonging to the plaintiff but, at that time, in the occupation of his lessee ; and situated on the island of Campo Bello, in the Province of New Brunswick, on a wharf there, belonging to the plaintiff, While the salt was so stored, rent becoming due from the lessee, the plaintiff, on the 31st of September, 1835, finding the salt so in the store, distrained it for rent in arrear ; and it was duly proceeded with, and sold for the payment of the rent ; and the plaintiff became the purchaser of it. These proceedings were in the province of New Brunswick, where the plaintiff lived. In 1836 the defendant, without permission from, or knowledge of the plaintiff, obtained possession of the salt, and conveyed it into the State of Maine, where this action was brought to recover it, and in which a verdict has been returned for the defendant. The plaintiff moved for a new trial, and the Court reported so much of the evidence and of its ruling and instructions, as were necessary to present the grounds of the motion : one of which was, that the Court erroneously admitted the lessee as a witness for the defendant,

although objected to on the ground of interest; and the other, that the Court erroneously instructed the jury, " that a common warehouse, in the sense used in the law relating to this matter, was a building or an apartment in one, used and appropriated, by the occupant, not for the deposit, and safe-keeping of his own goods, but for the purpose of storing the goods of others, placed there in the regular course of commercial dealing and trading, to be again removed and re-shipped. That if they should find from the testimony, that the building or apartment, in which the salt was seized, had acquired the character of a warehouse, in the sense stated, and that the salt was the property of the defendant, and had been there placed by him, in the regular course of trade, the duties being paid, to be stored, and again removed or re-shipped," it was not liable to be distrained for the rent of the store.

It may be proper, that we should first consider the instruction to the jury. If that should turn out not to be sustainable, it will be unnecessary to examine the other question raised. It appears, that the laws of England and of New Brunswick are the same, as to the rights of landlord and tenant, in reference to the circumstances authorizing distraint to be made. The general principle in England is laid down to be, that whatever chattels are found by the landlord on the premises leased, whether belonging to the tenant, or a stranger, may be distrained for rent in arrear. 3 Blackstone's Com. 8. And numerous other cases might be cited to the same effect. To this general principle, however, exceptions have from time to time, been recognized. And the question is, was that stated by the Court on the trial, one of them?

In the time of Lord Holt it was adjudged " that goods delivered to any person, exercising a public trade or employment to be *carried, wrought* or *managed,* in the way of his trade or employment," were for the time, privileged from distraint. *Gisbourn* v. *Hunt,* 1 Salk. 249. This authority seems to be the basis upon which all the after decisions have been placed. Comyn in his treatise upon landlord and tenant, p. 385, adopts the same general principle. He says, that " when property

has been delivered over to the lessee for some purpose, connected with trade, it is privileged from distress, and instances a horse sent to a farrier's shop, yarn sent to a weaver, cloth sent to a tailor, corn sent to mill, or to market, goods delivered to a common carrier, a horse, &c. at an inn, and goods of a principal sent to a factor, and placed by him in a warehouse on a wharf, at which they were landed. In all these cases the articles would be in the hands of such persons, exercising, in the language of Lord Holt, a public trade, and would be so in their hands " to be carried, wrought, or managed."

The first case in which it was expressly decided, that goods in the hands of a factor, were within the exception, was that of *Gilman* v. *Elton*, 3 Brod. & Bingham, 355. Dallas C. J. remarks, that the goods distrained in this case, it clearly appears, were received by the factor, in that particular character, and that it would be detrimental to the public, and inconsistent with the cases, if he were to hold them liable to seizure, in the manner contended for. Park J. after noticing the principle laid down by Lord Holt, asks, if goods so situated were not so placed to be managed. Burrough J. remarked, that no one could read the case, *Francis* v. *Wyatt*, 3 Burrow, 1498, (in which a carriage put up at a common livery stable, had been seized for rent, and was not supposed to come within the exception,) without seeing that the case of factors falls within the exception. Richardson J. remarked, that the advancement of trade equally, requires that goods should be placed in the hands of a factor for sale, as that they should be placed in the hands of a carrier for carriage. And that goods put into the hands of a trader to be wrought, or manufactured, or managed, are always protected from distraint.

In the next case which came before the same Court, 1 Bingham, 282, *Thompson* v. *Mashiter*, the reporter's abstract is, that " goods landed at a wharf and deposited by a *factor*, to whom they were consigned, in a warehouse on the wharf, till an opportunity for sale should present itself, are not distrainable for rent due in respect of the wharf and warehouse." Dallas C. J. in that case says, that " it has not been argued, that

the goods would have been liable, if they had been sent immediately to the wharfinger, and had remained on his hands. We may therefore assume, that for public convenience, and the benefit of trade, goods so deposited would not have been liable." Again he says, "it makes no difference whether the warehouse be in the factor's occupation, or hired for the purpose of the deposit. At the close of the case, the C. J. recollecting seemingly, that he had no authority, from any adjudged case, for including goods landed on a wharf in the exception, remarked, "that the exception for goods on a wharf, though only asserted in argument, in *Francis* v. *Wyatt*, was not dissented from by the Court or adverse counsel." And there is much reason for this exception, as wharves are ordinarily, public landing places, to, from, and upon which people are accustomed to come, and go, at their pleasure, as upon a highway, and the landlord must know, that goods are continually landed thereon, indiscriminately, for short periods, for amotion in various directions.

The next case, in the order of time, on the subject of this exception, came before the Court at the nisi prius, *Matthias* v. *Mesnard*, 2 Car. & P. 366. The reporter's abstract is, that "corn sent to a factor for sale, and deposited by him in the warehouse of a granary-keeper, he not having any warehouse of his own, is under the same protection against a distress for rent as if it were deposited in a warehouse belonging to the factor himself." The counsel for the lessor in this case took the exception, that "the decisions had never extended farther than to the protection of goods in the store, occupied by the *factor* himself." Best C. J. said, "if the cases referred to had decided only the insulated points, as to a wharfinger's and factor's protection, he should have paused; but, that the Judges in those cases only decided the general principle, &c. But that many years ago exceptions in favor of trade were admitted, that a landlord must know, (meaning doubtless in the situation this was,) that he cannot take the corn of other parties; and, therefore, if his tenants are granary-keepers, he can take other security for his rent. What wharfinger, or what

person living in the country would send articles to a granary-keeper if they were to be put in danger in this way?"

These are all the adjudications in England, that have come under my observation, directly bearing upon the case at bar; which seems to be a case of simple storage, by the owner himself, until an opportunity should offer to re-ship the goods. Now, can the defendant's goods be brought within the exceptions of the right of the landlord to distrain, "any goods found on the premises, whether belonging to the lessee or to a stranger?" If an exemption can be claimed in this case, in what case could a landlord distrain the goods of a stranger in a store or a warehouse of his lessee? The Court, however, in charging the jury in this case took a distinction between a public warehouse, kept publicly for storing goods, and one kept for the private use of an individual. But it may be doubted if any such distinction will hold. There is no adjudged case, that distinctly sanctions it. It is true that in a late edition of Bradby's Treatise on Distresses, by Adams, chap. XI, the editor has introduced into the text, the following passage, "so also goods landed at a wharf, and deposited in a warehouse there, cannot be distrained for the rent of the warehouse, and it is immaterial whether they are deposited by the principal or his factor." And cites the before mentioned cases of *Francis* v. *Wyatt*, and *Thompson* v. *Mashiter.* But these cases do not authorize any such interpolation. Dallas C. J. in the latter case, speaks of goods sent to a wharfinger, with reference to the case then before him, which was a case of goods sent to a *factor* for sale, and was no doubt, of opinion that goods so sent to a wharfinger or landed on a wharf would have been protected. And from the language he uses it may be inferred that he considered goods imported, and landed on a wharf would be protected *there* from distraint. But there is not a scintilla in either of the cases, that would tend to show, if the owner imports goods, and stores them in a warehouse on the wharf, whether owned by himself or others, or elsewhere, for safe custody merely, and until they can be conveniently re-shipped, that they would be exempted from

distraint.   I therefore cannot come to any other conclusion than that the ruling and instruction of the Court was incorrect; but as my brethren are of a different opinion, judgment must be entered on the verdict.