**THOMAS et al. v. SPRUKS.**

**No. 6241.**

Circuit Court of Appeals, Third Circuit.

May 6, 1937.

J. A. Welsh, of Shamokin, Pa., A. Allen Woodruff, of Philadelphia, Pa., and Penrose Hertzler, of Pottsville, Pa. (Morgan, Lewis & Bockius, of Philadelphia, Pa., of counsel), for appellants.

George W. Morrow and Ralph W. Rymer, both of Scranton, Pa., for appellee.

Before BUFFINGTON, DAVIS, and BIGGS, Circuit Judges.

BUFFINGTON, Circuit Judge.

In this case it appears that the Philadelphia & Reading Coal & Iron Company and the Fulton Coal Company owned the anthracite coal mining land here involved and leased the same to the Northumberland Mining Company on a coal royalty per ton for all coal "mined and shipped from the Fulton lands and that may be taken and shipped from the Enterprise culm banks or *sold upon the demised premises*." It further provided the lessee each month make a statement of all coal "mined and shipped from or sold upon the demised premises."

On May 30, 1934, Charles Spruks, the appellee, by written contract with the lessee, agreed to buy approximately 25,000 tons of coal which, when mined, was to be stored on the premises. This was done, Spruks paid for it, and on the huge pile of coal thus paid for and stored on the premises he placed a conspicuous sign reading as follows:

> "Notice
> "No Trespassing
> "Property of Charles Spruks
> "Scranton, Pennsylvania"

Thereafter Northumberland became in arrears for its coal royalty and on November 3, 1934, Reading and Fulton issued a landlord's warrant and levied on Spruks' coal.

On November 5, 1934, Northumberland petitioned the court below to reorganize under section 77B, Bankr.Act (11 U. S.C.A. § 207), and thereupon the court below restrained Reading and Fulton from taking action against Northumberland on the landlord's warrant. Subsequently Reading and Fulton petitioned for leave to sell the coal. Spruks and Northumberland denied such right, the former averring that "he purchased and paid for the coal for the purpose of removing it from the premises and selling it to purchasers as fast as orders for it were obtained." Spruks further averred that, "although the coal in the bank referred to has been fully paid for by him, he has been obliged to leave the coal on the premises until a market for it could be obtained." In its answer Northumberland averred that "Philadelphia & Reading Coal & Iron Company and the Fulton Coal Company were notified of the storing of said coal upon said premises for the account of said purchasers."

Subsequently, by consent, it was agreed by all parties that the coal should remain on the premises and Spruks be allowed to sell as he could and pay the money received by him into the registry of the court; that from the money so paid in, Reading and Fulton should be paid the tonnage royalty owing by Northumber-

land on Spruk's coal, and the claims of all parties on the stored coal should attach to the fund.

■ Upon hearing the proofs and contentions of all parties, the trial judge held the fund paid in by Spruks should be paid to him less the royalty and costs of administration. Did the court below, sitting in bankruptcy, commit error in so decreeing? We are of opinion it did not.

Putting aside the many questions discussed and assuming the right of Reading and Fulton to levy and sell on a landlord's warrant, we feel that the decisive question is the one on which the court below based its decision, namely, whether the case presented a trade exemption from levy and sale on a landlord's warrant.

This case concerns the practical operations of a great industry, to wit, the mining and marketing of anthracite coal. The whole object of that industry is twofold, the steady mining of the coal which gives in royalty a continuous income to the land owner, and profit to the lessee arising from continuous mining. Now anthracite is a highly seasonal article and not only is it seasonal in general, but the character of each seasonal period is controlled by the weather conditions of the particular season. In other words, the winter months alone demand coal in large quantities, and unless those winter months are cold, even the seasonal demand drops off. In the face of these adverse trade conditions, it is clear, and a practical minded court will take judicial notice of the fact, that it is to the interest of land owner, lessee operator, miner, and the consuming public that the anthracite industry shall, as far as possible, be placed on a nonseasonal basis. And this is done by the coal dealer buying coal at a nonseasonal time and avoiding the two handlings of it involved, first, in moving it to his yard, and, secondly, in delivering it to his customers when seasonal needs lead the consumer to buy. This is obviated by mining the coal in the Summer, storing it on the premises as mined, and removing the coal in the seasonal period when coal is in demand. In this way landlord, tenant, miner, coal buyer, and the consumer are benefited and co-ordinated, as far as possible, in making anthracite coal mining a nonseasonal industry.

■ So regarding, the trial court, in view of the pleadings, facts, and provision quoted which contemplated, as we have noted, coal sold upon the demised premises, held this was a proper trade exception which exempted stored coal from distraint for royalty rent, all of which was properly stated by it as follows:

"The general exception in favor of trade as stated by the courts and set forth in 36 C.J. 562, § 1647, is as follows: 'In the interest of trade and commerce, it has become a settled rule that, where the tenant in the course of his business *is necessarily put in possession* of the property of those with whom he deals or those who employ him, such property, although on the demised premises, is not liable to distress for rent due from the tenant.' Karns v. McKinney, 74 Pa. 387. In observing this exception, Gibson, Ch. J., in Brown v. Sims, supra [17 Serg. & R. (Pa.) 138], said: 'Where the course of the business must *necessarily put the tenant in possession* of the property of his customers, it would be against the plainest dictates of honesty and conscience, to permit the landlord to use him as a decoy and pounce upon whatever should be brought within his grasp, *after having received the price of its exemption in the enhanced value of the rent.'*

"The application of the exception in favor of trade must be made in the light of present-day trade and business. The trend of decisions, due to the exigencies of business, has been to broaden the scope of this exception. Manufacturers' Finance Acceptance Corporation v. Jordan Distributors, Inc., 111 Pa.Super. 448, 170 A. 321. This court feels that the scope of the exception will not be broadened in holding as it does that the facts in the present case come within the exception. In mining coal, as it had the right to do under the lease, the Northumberland Mining Company *could not continue business unless it dealt with others to dispose of the coal mined.* Due to the exigencies of transportation and *market conditions,* it frequently happens that coal must be stored on the surface both before and after sale. In the interest of trade and commerce, coal sold by the tenant mining company, but stored and not removed by the purchaser, should not be subject to levy by the landlord. Accordingly, this court holds that the petitioner had no authority to levy on the coal owned by Spruks or to make sale thereof on a landlord's distress warrant;

that the fund in court, representing the proceeds of the said coal, which was owned by Spruks, must be paid to Spruks, the respondent."

Accordingly, its decree is affirmed.