UNITED STATES of America

v.

NATIONAL CAPITAL STORAGE AND MOVING COMPANY, Inc., James B. Guinan, President of National Capital Storage and Moving Company, Inc., and Elliott P. Y. Powell, Marshall P. Powell, Shirley T. Powell, Barbara S. Powell, doing business as a partnership in the name of Powell & Powell.

Civ. No. 16510.

United States District Court
D. Maryland.
March 16, 1967.

Thomas J. Kenney, U. S. Atty., and Arthur G. Murphy, Asst. U. S. Atty., Baltimore, Md., and Fred William Drogula and Leslie A. Nicholson, Attys., Dept. of Justice, Washington, D. C. (Barefoot Sanders, Asst. Atty. Gen., and Harland F. Leathers, Atty., Dept. of Justice, Washington, D. C., on brief), for plaintiff.

Arthur V. Butler and Butler & Gorman, Washington, D. C., for National Capital Storage & Moving Co. and James B. Guinan, defendants.

Roger D. Redden and Smith, Somerville & Case, Baltimore, Md., for Powell & Powell, defendant.

THOMSEN, Chief Judge.

The United States brought this action on its own behalf and on behalf of certain members of the Armed Forces, to have a distraint sale declared ineffective and unlawful insofar as it included household goods and personal effects of military personnel stored by the United States pursuant to 37 U.S.C.A. § 406(d) and regulations issued thereunder.[1] Most of the personnel whose goods are involved in this case were either on assignment overseas or were in the process of returning from such assignments. The complaint sought delivery of the goods to the government and other relief. After mesne proceedings set out below, the case has been tried by the Court without a jury.

### Facts

Defendant partnership, Powell & Powell (Powell), leased to the other defendant, National Capital Storage and Moving Company, Inc. (National), a warehouse located at 4671 Tanglewood Drive, Hyattsville, Maryland, together with an office at 4611–31 Tanglewood Drive. Powell's office was at 4651 Tanglewood Drive.

On several occasions National failed to pay the monthly rent. In February 1964 Powell filed an eviction proceeding against National, and on April 14, 1965, Powell issued a distraint upon any goods or chattels found on the leased premises for rental arrearages in the sum of $13,850. On April 15 a deputy sheriff of Prince George's County distrained on all the goods and chattels located in the warehouse premises, as well as in National's office. A notice of sale was published and on May 19, 1965, a sale was conducted of the property listed in the notice, including the property of the Armed Forces personnel stored pursuant to section 406(d). The property listed included all of National's equipment and about 100,000 lbs. of goods stored by private parties, in addition to the 52 lots

---

1. Pursuant to section 406(d) the Department of Defense has set up a nationwide program for the non-temporary storage of baggage and household effects of military personnel under contracts providing for storage facilities at some 2,500 warehouses.

(approximately 145,000 lbs.) stored by the government. Before the issuance of the distraint, Powell knew that the leased premises were being used by National to engage in the storage and moving business, and that the articles in the warehouse were not National's property but were stored by others. On the morning of the sale a government storage specialist told Powell, Powell's attorney and the deputy sheriff that a part of the property distrained upon belonged to military personnel, had been stored pursuant to section 406(d), and could not legally be sold. Nevertheless, Powell insisted upon going ahead with the sale while the government man was attempting to telephone a government attorney for instructions. Powell, the only bidder at the sale, bought all the goods and chattels as a single lot for $14,000. The property was not offered in separate lots.

On June 11 the United States formally notified Powell that among the goods and effects located in the warehouse were personal property and household goods belonging to members of the Armed Forces, and asked that this property be delivered to the government. Powell refused, unless the United States agreed to pay all (later reduced to a proportionate part) of National's arrearages and also agreed to rent the warehouse from Powell for at least 15 years at 95¢ a square foot. Since Powell claimed the right to hold and sell the property of the military personnel, the United States commenced the present action and applied to this Court for a temporary restraining order.

After a hearing on June 15, 1965, Judge Winter entered a consent order enjoining the sale of the goods which had been stored with National by the United States. The order further provided that the United States should (1) take possession of the goods and (2) have the goods appraised by a mutually acceptable party. Appraisers were hired and the goods in dispute belonging to military personnel were valued at $38,713.25.[2] The order was based upon a stipulation of the United States pursuant to 40 U.S.C.A. §§ 308, 309, as amended by P.L. 89–30, June 2, 1965.[3]

---

**2.** Certain items belonging to the military personnel were admittedly exempt from distraint under Art. 53, sec. 18 of the Anno. Code of Maryland (1957 ed.). Those items were but a small portion of the total goods stored, and were appraised at $1,149.

**3.** Those sections read as follows:

"§ 308. *Releasing property from attachment.*

"Whenever any property owned or held by the United States, or in which the United States has or claims an interest, shall, in any judicial proceeding under the laws of any State, district, or territory, be seized, arrested, attached, or held for the security or satisfaction of any claim made against such property, the Attorney General, in his discretion, may direct the United States Attorney for the district in which the property is located, to cause a stipulation to be entered into for the discharge of such property from such seizure, arrest, attachment, or proceeding, to the effect that upon such discharge, the person asserting the claim against such property shall become entitled to all the benefits of this section and section 309 of this title.

Nothing herein contained shall, however, be considered as recognizing or conceding any right to enforce by seizure, arrest, attachment, or any judicial process, any claim against any property of the United States, or against any property held, owned, or employed by the United States, or by any department thereof, for any public use, or as waiving any objection to any proceeding instituted to enforce any such claim."

"§ 309. *Payment.*

"In all cases where a stipulation is entered into under section 308 of this title, and, in consequence thereof, the property is discharged, and final judgment is afterward given in the court of last resort to which the Attorney General may deem proper to cause such proceedings to be carried, affirming the claim for the security or satisfaction of which such proceedings have been instituted, and the right of the person asserting the same to enforce it against such property by means of such proceedings, notwithstanding the claims of the United States thereto, such final judgment shall be deemed, to all intents and purposes, a full and final determination of the rights

A final decree was entered in the eviction proceeding on September 1, 1965, directing National to vacate the premises and pay Powell $14,925 to cover past rent and other charges arising out of the dispute. The decree further provided that upon payment Powell should relinquish all right, title, and interest in the goods distrained upon and sold to Powell on May 19, 1965. Meanwhile Powell had leased the warehouse to Sears, Roebuck. When National vacated the premises, Powell permitted National to remove to another warehouse the 100,000 lbs. of property stored by private parties, and to pay to Powell from time to time amounts received by National for storage charges. Some $8,920 has been paid by National to Powell on account of the judgment.

### Contentions of the Parties

The United States argues (1) that under the Maryland law of distress the landlord of a storage warehouse has no right to distrain upon goods stored by others with the tenant in the course of its storage and moving business; and (2) even if the Maryland law were otherwise, "state distraint laws cannot lawfully operate upon property belonging to members of the Armed Services of the United States which is stored under Federal contracts and pursuant to a Federal program." The United States, therefore, contends that the distraint and sale gave Powell no title to the property of the servicemen stored by the United States, and no right to withhold such property. The United States also seeks recovery from both National and Powell of $4,882, representing appraisers' fees, the cost of removing the property of the servicemen to another warehouse and the additional costs of storage therein. Powell disputes each of the government's contentions, challenges the standing of the United States to maintain this action, and contends that on June 15, 1965, the date of Judge Winter's order, the United States had no interest in the property in question superior to that held by Powell by virtue of the distraint sale.

### Standing of the United States

■ Powell's contention that the United States "has failed to substantiate either a direct interest or a representative capacity sufficient to challenge Powell & Powell's title to the goods distrained upon", cannot be sustained. The storage of baggage and household effects pursuant to 37 U.S.C.A. § 406(d) is part of a comprehensive program dealing with the pay and allowances of military personnel. In United States v. Arlington County, Commonwealth of Virginia, 4 Cir., 326 F.2d 929, 931 (1964), it was stated:

"* * * The special interest of the sovereign United States in the protection and enforcement of its policies and programs with respect to the members of the armed forces has been affirmed by the courts in numerous instances."

Moreover, the United States asserts a direct pecuniary interest as the result of a potential liability up to $10,000 per man for loss or damage to such goods. See 31 U.S.C.A. § 240 et seq. In United States v. Arlington County, Commonwealth of Virginia, supra, at 932, the Court stated that "even in the absence of immediate pecuniary interest" the United States was not precluded from bringing suit to enforce its policies and programs.

It follows that the United States has standing to maintain this action.

of such person, and shall entitle such person, as against the United States, to such rights as he would have had in case possession of such property had not been changed. Whenever such claim is for the payment of money, and the same is by such judgment found to be due, the presentation of a duly authenticated copy of the record of such judgment and proceedings shall be sufficient evidence to the proper accounting officers for the allowance thereof; and the same shall thereupon be allowed and paid out of any moneys in the Treasury not otherwise appropriated. The amount so to be allowed and paid shall not, however, exceed the value of the interest of the United States in the property in question."

*The Applicable Law: State or Federal?*

█ The leading case on this subject is Clearfield Trust Company v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), in which the Court held that the rights and duties of the United States on commercial paper issued by it should not be governed by the local law but by uniform federal law to be ascertained by reference to the federal law merchant developed during the hundred years under the regime of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865 (1842), and that in the absence of an act of Congress it is the duty of the federal courts to fashion the governing rule according to their own standards. The *Clearfield* opinion and later cases have indicated that the federal courts may accept the state law as the appropriate federal rule when the government places itself in a position where its rights necessarily are determinable by state law, as when it purchases real estate from one whose title is invalid by that law in relation to another's claim, or the state law furnishes convenient solutions in no way inconsistent with adequate protection of the federal interests. Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); Bank of America Nat. Trust & Sav. Ass'n v. Parnell, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956); Board of County Commissioners of Jackson County v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939).

The most recent Supreme Court decision on the subject is Wallis v. Pan American Pet. Corp., 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966), in which the Court said:

" * * * In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown. * * * "

█ There is a federal policy and interest in providing secure storage for the property of members of the Armed Forces under section 406(d). In United States v. Standard Oil Co., 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947), the Court said:

"Perhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces. To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces and persons outside them or nonfederal governmental agencies, the scope, nature, legal incidents and consequences of the relation between persons in service and the Government are fundamentally derived from federal sources and governed by federal authority. * * * For, as the Federal Government has the exclusive power to establish and define the relationship by virtue of its military and other powers, equally clearly it has power in execution of the same functions to protect the relation once formed from harms inflicted by others." 332 U.S. at 305–306, 67 S.Ct. at 1607.

█ The government argues that a uniform federal rule governing the right of distraint and other possible claims against property so stored is necessary to protect the interest and policy of the United States in providing secure storage for the property of military personnel. Undoubtedly, that interest should be protected. But it is not clear that uniformity in all details is necessary to protect that policy and interest, or that it is necessary to formulate and apply rules of federal common law in this situation. No decision precisely in point has been cited or found; and it is not necessary to decide in this case whether a uniform rule should be adopted, provided there is no significant conflict between the Maryland law and any federal policy or interest. *Wallis,* supra.

*The Maryland Law*

Unfortunately, the Maryland law of distress is not entirely clear. In Mc-Creery v. Clafflin, 37 Md. 435 (1873),

the Court of Appeals held that the goods of a principal in the hands of a commission merchant for sale are not distrainable for rent.[4]  The Court said:

> " *  *  *  Whilst the general rule holds all chattels found upon the demised premises, *prima facie* liable for the rent, it is subject to the exceptions recognized on grounds of public policy, for the benefit of trade, or the preservation of the place, of certain classes of articles; and embrace all property of like character or *ejusdem generis*.

> "Whilst there have been differing adjudications as to what are the exceptions, and as to the extent of the exemption under the privilege of trade, so far as our researches have extended, all the adjudged cases concur that goods delivered to tradesmen, artificers, carriers, factors, wharfingers, auctioneers, and the like, without qualification are exempted.  *  *  *" 37 Md. at 441.

The decision in *McCreery* and the quoted statement of the rule and exceptions are in accord with the general law of distress.  The cases directly in point establish the rule that goods stored in a tenant's warehouse used for the storage of goods of others are not liable to distraint for rent by the landlord.  See Owen v. Boyle, 22 Me. 47 (1842); Brown v. Sims, 17 Serg. & R., Pa., 138 (1828); Walker v. Johnson, 4 McCord (S.C.) 552 (1828); In re Northumberland Mining Co., M.D.Pa., 16 F.Supp. 63 (1936), aff'd Thomas v. Spruks, 3 Cir., 89 F.2d 998 (1937).  See also 52 C.J.S. Landlord and Tenant § 681 at 541–542 (1947); 32 Am.Jur., Landlord and Tenant, § 629 (1941); Annot. 62 A.L.R. 1106, 1121 (1929), and cases cited there-

in; Hunter, The Law of Distress, 56–60, 9th ed. (1905); Oldham and Foster, Distress, 125–137, 2d ed. (1889); Gilbert, The Law of Distresses and Replevins (1757).  Halsbury's Law of England, vol. 12, Distress, p. 461, 3d ed. (1955), states:

> "The goods [to be exempt from distress] must be put into the trader's hands that he may exercise his trade upon them; work and skill need not be bestowed upon the goods sent, if the trade in question does not involve such work and skill, and mere storage, whether for sale or otherwise, is enough if the storage or sale constitutes the trade in question  *  *  *."

There is a full discussion of the development of the law in Owen v. Boyle, supra.

In later Maryland cases there have appeared general statements that a distraining landlord may seize and sell any and all chattels not exempt under a statute, found upon demised premises, for payment of rent, whether they belong to others or not.  Kennedy v. Lange, 50 Md. 91 (1878); Mears v. Perine, 156 Md. 56, 143 A. 591, 62 A.L.R. 1100 (1928); Wilhem v. Boyd, 172 Md. 79, 190 A. 823 (1937); J. Holland & Sons, Inc. v. Ettleman, 225 Md. 84, 169 A.2d 394 (1961).  It should be noted, however, that in none of those cases had the goods distrained upon been left with the tenant by another in the course of the tenant's ordinary business.[5]  Nor did any of those cases discuss or cite *McCreery*.  Moreover, at the time *McCreery* was decided, there was in effect a statute similar to Article 53, section 18 of the Annotated Code of Maryland, 1957 ed., exempting certain items from distraint. See Chapter 169 of the Acts of 1870. Writing in 1953, the former Chief

---

4.  When *McCreery* was decided, a statute similar to Article 53, section 18 of the Annotated Code of Maryland (1957 ed.) was in effect, exempting certain items from distraint.  See Chapter 169 of the 1870 Laws of Maryland.

5.  Kennedy v. Lange involved goods in a dwelling house, rather than a place of business; in Mears v. Perine the Court

held that goods in *custodia legis* were not distrainable (the opinion does not reveal whether these were business premises, or how the goods happened to be on the premises); J. Holland & Sons, Inc. v. Ettleman and Wilhem v. Boyd involved goods owned by vendors who sold them to the tenants under conditional sales contracts.

**56**

Judge of the People's Court of Baltimore City stated: "All property temporarily put in possession of a tenant by his customers in the usual course of business, such as goods in the hands of an auctioneer, are not distrainable." Rhynhart, Distress, 13 Md.L.Rev. 185, 195 (1953).

■■ This Court concludes that *McCreery* is still the law in Maryland, and that a Maryland Court would decide that a landlord who has leased to a tenant a public storage warehouse has no right to distrain on property which has been stored by members of the public with the tenant in the ordinary course of the tenant's business. It follows that under Maryland law the distraint on the property stored by the United States and others was illegal, and that the sale to Powell of such goods was null and void.

If the law in Maryland were otherwise, it would significantly conflict with the federal policy and interest discussed above, and this Court would be obliged to seek, and if necessary to formulate, federal common law principles to govern the case.

■ If this Court had been forced to do so, it would unhesitatingly have adopted and applied the general law of distress in the United States and England as set out in Owen v. Boyle, in *Halsbury,* and in the other authorities cited with them, above. The interest of the federal government in providing secure storage for the effects of military personnel requires that where the tenant warehouseman, in the course of his dealings with the United States, is put in possession of the property of military personnel for storage, such property, although on the demised premises, is not subject to distress for rent due from the tenant.

### Damages

■ The United States is entitled to recover from National the costs and expenses which it has incurred by reason of National's failure to pay the rent to Powell and the resulting distraint, sale and eviction. Those expenses include the cost of removing the goods from the Tanglewood Drive warehouse and the additional cost of storage elsewhere during the contract period, in the total amount of $2,897.39. They also include the $1,405.00 which the government had to pay the appraiser. The appraiser's fee might also properly have been charged against Powell, if the consent order of June 15, 1965, had not provided that as between Powell and the government the cost should be borne by the government. The removal and restorage costs were due to the legal eviction of National by Powell, not to the illegal distraint and sale, and the government has no right to recover those expenses from Powell. In sum, the United States is not entitled to recover anything from Powell except its costs, and Powell is not entitled to recover anything from the United States. The United States is entitled to recover a judgment for $4,302.39, plus interest and costs against National. The rights of National and Powell inter se are fixed by the judgment in the eviction case.