James F. **BOCCARDO** and Lorraine V. Boccardo, husband and wife, doing business as Community Center, Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

No. C–71–510.

United States District Court, N. D. California.

April 26, 1972.

Carman, Mansfield & Mason, by E. Day Carman, San Jose, Cal., for plaintiffs.

James L. Browning, Jr., U. S. Atty., David E. Golay, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## MEMORANDUM OF DECISION

GEORGE B. HARRIS, Senior Judge.

This case arises from a Complaint for Breach of Contract and for Declaratory Relief filed herein on March 16, 1971. The Complaint alleged jurisdiction under the Tucker Act, 28 U.S.C. § 1346(a) (2) and, in addition, sought declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. A subsequent amendment to the Complaint was filed on June 25, 1971.

On November 18, 1971, a Pre-Trial Order for the case was filed. The matter was tried to the court on February 28, February 29, and March 1, 1972, and

was thereafter taken under submission for decision on April 11, 1972, following briefing by the parties.

## I. FACTS

Presently and at all times noted in the Complaint plaintiffs are the owners of the Community Bank Building ["Building"], 111 West St. John Street, San Jose, California. On or about August 24, 1966, plaintiffs and' defendant entered into a contract for the lease ["Lease"] of office space and premises within said building. The Lease covered two distinct areas within the building: Unit 1, originally leased from November 1, 1966 through July 31, 1967, and Unit 2, originally leased from October 15, 1966 through October 14, 1971. The space in issue here, Unit 2, is and has been occupied by the United States Selective Service System as a draft board.

Unit 2, like Unit 1, was subject to an option for renewal, which option was exercised by the Government and extended the term of the Lease, unless otherwise terminated, until approximately August 14, 1972.

Sometime after 1966, perhaps at the end of 1968 or the beginning of 1969, activity by war and/or draft protesters resulted in a series of disturbances in and around the Building and especially concentrated near the space occupied by the draft board. Such disturbances included physical damage to the interior of the Building, particularly in the elevators, hallways, and lavatories, picketing and milling, the communication of bomb threats to various tenants of the Building (including the draft board), and gunfire directed at the Building from an unknown source some distance away.

Most of the physical damage was attributable to reactions against the activities of the draft board, since the damage was primarily on the second floor of the Building, where the draft board is located, or below.

In January 1970, plaintiffs complained about such disruptive activities in a letter to the General Services Administration of the Government and threatened to terminate Selective Service occupancy unless other quarters were found. Plaintiffs offered other space to the General Services Administration, but such space was rejected as unsuitable. Selective Service declined to move, but did open its office earlier, thereby avoiding the milling and dissatisfaction of those visitors who had previously to wait for its later opening time.

On December 24, 1970, a person known as Brother John entered Unit 2 and set fire to the leased premises. The fire was extinguished without injury to persons. More than $15,000 was expended to repair the fire damage, all of which was covered by insurance.

As a result of the activities directed against the draft board or caused by persons having business therewith, plaintiffs hired guard security personnel, at a total expense of $2635.75, installed a closed circuit television monitoring system at an approximate expense of $800.00, and used in-house labor to effect repairs at a total estimated expense of $3744.00, which latter figure is based on four hours of such labor per week for three years at $6.00 per hour.

On December 26, 1970, plaintiffs attempted to terminate the Lease for Unit 2 by letter. The Government, by Mr. Kirby of the General Services Administration, declined an offer of alternative space as unsuitable. The Government refused to vacate and requested repairs to the premises.

Thereafter, plaintiffs filed the instant suit.

## II. LAW

### A. Jurisdiction—Remedy

■ This action is brought under the Tucker Act, 28 U.S.C. § 1346, which provides in pertinent part:

(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded . . . upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

Plaintiffs seek damages, a declaration of rights under the Lease, and the eviction of the Government from Unit 2. The Government counters that plaintiffs are not entitled to any damages and that equitable or declaratory relief is unavailable to them under the Tucker Act or under the Declaratory Judgment Act.

For purposes of the alleged claim to money damages, this court has jurisdiction of the matter under the Tucker Act.

What is not clear is the plaintiffs' right to requests for equitable relief by way of a declaration of rights under the Lease, a declaration of termination of the Lease, and the vacating of the premises by the Government.

Following the decision of the Supreme Court in United States v. Jones, 131 U. S. 1, 18–19, 9 S.Ct. 669, 33 L.Ed. 90 (1889), it has long been held that suits for equitable relief only cannot be maintained against the United States under the Tucker Act. *See, e. g.*, Casarino v. United States, 431 F.2d 775, 777 (2d Cir. 1970); Wells v. United States, 280 F.2d 275, 277 (9th Cir. 1960). The courts have, however, countenanced the award of equitable relief where incidental to a claim for money damages. R.E. D.M. Corporation v. Lo Secco, 291 F. Supp. 53, 58 (S.D.N.Y.1968) affirmed, 412 F.2d 303 (2d Cir. 1969); Blanc v. United States, 244 F.2d 708, 709–710 (2d Cir. 1957) affirming 140 F.Supp. 481 (E.D.N.Y.1956), cert. den., 355 U.S. 874, 78 S.Ct. 126, 2 L.Ed.2d 79 (1957); Clay v. United States, 210 F.2d 686 (D. C.Cir. 1953), cert. den., 347 U.S. 927, 74 S.Ct. 530, 98 L.Ed. 1080 (1954); Werner v. United States, 10 F.R.D. 245, 246–247 (S.D.Cal.1950) affirmed, 188 F.2d 266, 268 (9th Cir. 1951); Universal

Transistor Products Corp. v. United States, 214 F.Supp. 486, 487 n. 1 (E.D. N.Y.1963); DiBattista v. Swing, 135 F. Supp. 938, 940 (D.Md.1955).

There is also a question concerning the power of a court to grant declaratory relief against the United States as supplementary to a Tucker Act claim. In Raydist Navigation Corp. v. United States, 144 F.Supp. 503, 505 (E.D.Va. 1956), the court noted that while the Declaratory Judgment Act is not a consent of the United States to be sued, where the United States has given consent to be sued under the Tucker Act, a proceeding by way of declaratory relief is proper. More recent cases, however, cast some doubt on the above statement. *E. g.*, Blaze v. Moon, 315 F.Supp. 495, 497 (S.D.Tex.1970), affirmed, 440 F.2d 1348 (5th Cir. 1971). In King v. United States, 395 U.S. 1, 89 S.Ct. 1501, 23 L. Ed.2d 52 (1969), the Supreme Court reversed a decision of the Court of Claims, 390 F.2d 894, 182 Ct.Cl. 631 (1968), and held that it was not within the power of that court to grant declaratory relief. *See* Superior Beverage Company v. State of Ohio, 324 F.Supp. 564, 566 (N.D.Ohio 1971). Since the Tucker Act provides that where a district court has jurisdiction thereunder it is sitting essentially as a court of claims, *see* United States v. Sherwood, 312 U.S. 584, 590–591, 61 S.Ct. 767, 85 L.Ed. 1058 (1941), it is arguable that the decision in *King* indicates that declaratory relief is also unavailable in Tucker Act cases brought in a district court rather than the Court of Claims.

Nonetheless, whether because of the inclusion of a claim under the Declaratory Judgment Act or because being incidental to a claim for money damages, this court will assume, without deciding, that plaintiffs are entitled to seek herein those forms of non-money relief prayed for.

B. *Applicable Law*

The parties have raised an issue as to whether state or federal law gov-

erns the interpretation of the Lease under the Tucker Act.

■ Following the general rule that construction or application of provisions in a government contract are to be under federal, not state, law, Woodbury v. United States, 313 F.2d 291, 295 (9th Cir. 1963); Stewart Sand and Material Co. v. Southeast State Bank, 318 F. Supp. 870, 876 (W.D.Mo.1970); Byron Jackson Co. v. United States, 35 F.Supp. 665, 667–668 (S.D.Cal.1940), it has been held repeatedly that a lease executed by the United States must likewise be tested against federal law. *E. g.*, United States v. Morgan, 196 F.Supp. 345, 349 (D.Md.1961), affirmed, 298 F.2d 255 (4th Cir. 1962); American Houses v. Schneider, 211 F.2d 881, 882–883 (3d Cir. 1954); Girard Trust Co. v. United States, 149 F.2d 872, 874 (3d Cir. 1945); Patton v. United States, 139 F. Supp. 279, 283 (W.D.Pa.1955); Riverview Properties v. United States, 102 F. Supp. 934, 937 (M.D.Pa.1952). *But see* Werner v. United States, *supra* at 247.

In the absence of federal cases in point, the court may turn for guidance to the general law of landlord and tenant. United States v. Morgan, *supra* at 349; Girard Trust Co. v. United States, *supra* at 874. It would also seem permissible for the court to refer to state law in the absence of federal authority or where not in conflict therewith and where it "furnishes convenient solutions in no way inconsistent with adequate protection of the federal interests." United States v. National Capital Storage and Moving Co., 265 F.Supp. 50, 54 (D.Md.1967).

### C. *Mutuality under the Lease*

■ Plaintiffs contend at the outset that the Lease is void and unenforcible because it lacks mutuality of obligation in that the Government retains the unilateral right to terminate at any time. The Lease provides in pertinent part:

12. This lease may be terminated in whole or on a Unit basis as follows:

    \*    \*    \*    \*    \*    \*

Unit No. 2: By the Government only by giving at least sixty (60) days' notice in writing to the Lessor, provided no termination notice shall be issued prior to August 14, 1968.

Plaintiffs' reliance on California Civil Code § 1580 or on the general law relating to mutuality in contracts is misplaced. California Civil Code § 1580 provides:

*Mutuality of Consent.* Consent is not mutual, unless the parties all agree upon the same thing in the same sense. But in certain cases defined by the Chapter on Interpretation, they are to be deemed so to agree without regard to the fact.

There is here no dispute about *consent*; certainly plaintiffs do not contend that they were mistaken or uninformed as to the provisions of the Lease.

■■ Moreover, the above-cited provisions of the Lease are not repugnant to the more general notion of mutuality of *obligation*. There is no requirement in the law that for each right created by a contract in one party the other party must have a reciprocal right of the same nature. David Roth's Sons, Inc. v. Wright and Taylor, Inc., 343 S.W.2d 389, 390 (Ky.Ct.App.1961). Thus while it might lie for a court of equity to deny specific performance of a contract where mutual promises are not coextensive and where such enforcement would be oppressive, it does not lie for a court to deny the legal validity of such a contract where the adequacy of consideration is a matter exclusively for the decision of the contracting parties. 1 Williston on Contracts § 105A at 425–426 (3d ed. 1957).

■ Where, as here, the right to cancel is in some way restricted, as by the giving of substantial notice, the questioned contract cannot fail for want of consideration. *See* Sylvan Crest Sand & Gravel Co. v. United States, 150 F.2d 642, 644–645 (2d Cir. 1945); Mutz v. Wallace, 214 Cal.App.2d 100, 109–111, 29 Cal.Rptr. 170 (1963); David Roth's

Sons, Inc. v. Wright and Taylor, Inc., *supra* at 391; 1 Witkin, Summary of California Law, Contracts § 77 at 82 (7th ed. 1960). Here there was the consideration not only of the requirement of 60 days' notice for termination, but also the additional factor that such right could not in any event be exercised for a period of nearly two years after the Lease was in effect.

In addition, it has been held that the defense of want of mutuality of obligation applies only to executory contracts not, as here, to an executed contract or portion thereof. Mutz v. Williams, *supra* at 109.

### D. *Breach of Implied Covenant*

Paragraph IV of plaintiffs' Complaint alleges that,

> By the terms of said occupancy defendant impliedly agreed to conduct itself in a manner so as to not cause damage to the premises nor the threat of harm to persons or property in or near the premises, and to prevent a nuisance, as well as activities dangerous to persons and property within the area.

This allegation encompasses a claim of breach of implied covenant as well as a claim of creation of (or failure to abate) a nuisance; we deal in this portion of the discussion only with the first claim.

■ By its terms, the Tucker Act applies to "implied" as well as "express" contracts. An unbroken line of authority has restricted the Tucker Act to contracts implied "in fact," as distinguished from contracts implied "in law." Williston's definitions of such terms, as adopted in the case of Stewart Sand and Material Co. v. Southeast State Bank, *supra* 318 F.Supp. at 874, will suffice here:

> "The expression 'implied' contract has given rise to great confusion in the law * * * Some of these rights [enforced by contractual actions], however, were created, not by any promise or mutual assent of the parties, but were imposed by law on the defendant irrespective of, and some-

times in violation of, his intention. Such obligations were called implied contracts. Another name is that now generally in use of 'quasi contracts'. This expression makes clear that the obligations in question are not true contracts, and it also avoids confusion with another class of obligations which have also been called implied contracts. This latter class consists of obligations arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words. Such transactions are true contracts and have sometimes been called contracts implied in fact. 1 Williston Contracts, § 3 (3d Ed.1957)" [Footnotes omitted.]

■ The issue here is whether, despite the absence of such promise in the Lease, the Government nonetheless impliedly agreed to prevent damage by third parties such as is alleged in this case, either by (1) removing Selective Service operations when such damage began, or (2) by providing private security for its own activities as well as for those of other tenants, or (3) by indemnifying plaintiffs for any such damage caused by the disturbances generated towards the activities of the Selective Service.

■ We find the Government did not so promise, in fact or in law. We are mindful of the general principle that, even in the absence of an express covenant, the lessee is under an implied obligation to treat property so as to avoid injury to the inheritance and to return the property to the lessor in as good a condition as received, excepting normal wear and tear. *See* United States v. Bostwick, 94 U.S. 53, 65–66, 24 L.Ed. 65 (1876); Patton v. United States, *supra* at 283; Riverview Properties v. United States, *supra* at 937. This the Government has done; no action by any employee or agent of the Selective Service has been alleged to have directly caused any damage to plaintiffs. Rather, the question is what

if any was the Government's affirmative duty to prevent the damage caused by unrelated third persons.

Whatever the Government's implied duty to keep its own occupied premises in good condition, we cannot find a covenant or promise in fact that the Government would also take affirmative action to supply security or otherwise safeguard the premises of the Building. Plaintiffs rely in part on California Civil Code § 1941.2, which provides in pertinent part that the lessee is obligated by law:

> (4) Not to permit any person on the premises, with his permission, to willfully or wantonly destroy, deface, damage, impair or remove any part of the structure or dwelling unit of the facilities, equipment, or appurtenances thereto, nor himself do any such thing.

The Government certainly did not permit any persons to damage its own premises, and as to the remaining areas of the Building, they were under the concurrent supervision of the plaintiffs and the other tenants, and as to which the Government had neither exclusive control nor the obligation to safeguard. As noted in Harris v. Joffe, 28 Cal.2d 418, 423, 170 P.2d 454, 458 (1946):

> When a portion of the premises is reserved by the landlord for use in common by himself and his tenants, or by different tenants, a duty is imposed upon the property owner to keep that particular portion of the premises in a safe condition. [Citations omitted.]

There is no evidence that plaintiffs did not know that Unit 2 was to be occupied by the Selective Service or that the character of the activities therein changed appreciably between the date of initial occupancy and the onset of the first disturbances and physical damage. To imply a promise by the Government to prevent or repair such damage by third parties would not be implementing any held but unexpressed intention of the parties, but would instead be contrary to that intention as well as to the express words of the Lease.

The parties expressly agreed that,

> The Lessor shall maintain the demised premises, including the building and any and all equipment, fixtures, and appurtenances, furnished by the Lessor under this lease in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the Government's agents or employees.

No fair reading of the above provision can support plaintiffs' claim that there rested on the Government an affirmative duty to prevent or repair damage caused by the acts of third parties under the circumstances presented here.

### E. *Nuisance*

Plaintiffs assert their right to terminate the Lease upon the contention that the Government has created or is maintaining a nuisance in Unit 2, relying for support on the following provision of California Civil Procedure § 1161:

> 4. Any tenant . . . committing waste upon the demised premises, contrary to the conditions or covenants of his lease, or maintaining, committing, or permitting the maintenance or commission of a nuisance upon the demised premises . . . thereby terminates the lease.

California Civil Code § 3479 defines a nuisance thus:

> Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner . . . is a nuisance.

■ A careful survey of the applicable law, both state and federal, convinces this court that the law of nuisance is not applicable to the activities of the Government here such as to justify plaintiffs' termination of the Lease on that ground.

First, a nuisance is a species of tort. 58 Am.Jur.2d Nuisances § 19 .at 580. But the Tucker Act, by its terms, applies only to claims for damages "in cases not sounding in tort." 28 U.S.C. § 1346(a) (2). Roxfort Holding Co. v. United States, 176 F.Supp. 587, 590 (D. N.J.1959). *But cf.* United States v. Bostwick, *supra* at 68; Palomo v. United States, 188 F.Supp. 633, 636 (D. Guam 1960).

Second, it is clear that no hard and fast rules exist for determining when a nuisance exists. Rather, the court must look to the totality of circumstances and attempt to balance the interests of both parties as well as those of the public. The basic criterion in the law of private nuisance is reasonableness of conduct. 5 Powell on Real Property para. 705 at 320 (1971 ed.). There can be no liability for nuisance unless the defendant's conduct is unreasonable under the circumstances. Prosser on Torts § 87 at 581 (4th ed. 1971).

The flaw in plaintiffs' argument surrounds the fact that the Government, operating its draft board in Unit 2, has done nothing unreasonable. The nuisance as alleged by plaintiffs is not the existence or operation of the draft board *per se,* but rather the reactions of unrelated third parties. To the extent that these reactions have manifested themselves outside the premises under the exclusive control of the Government, it appears that the Government, under the terms of the Lease, is under no affirmative obligation to prevent or correct them.

Third, there is a general proposition that conduct will not be held to constitute a nuisance where authority therefor exists by virtue of legislative enactment. 58 Am.Jur.2d Nuisances § 228 at 831. California has codified this proposition in California Civil Code § 3482:

Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance.

In City of Union City v. Southern Pac. Co., 261 Cal.App.2d 277, 281, 67 Cal.Rptr. 816 (1968), the court found that,

The Civil Code section [§ 3482] refers to what is expressly *permitted* by a statute. What is *required* by a statute, including what is required by an authorized commission acting under authority of statute, cannot be a nuisance.

Section 3482 was also elucidated in Hassell v. San Francisco, 11 Cal.2d 168, 171, 78 P.2d 1021, 1022 (1938):

"A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the legislature contemplated the doing of the very act which occasions the injury." [Citation omitted.]

Although no case has been found in which § 3482 has been discussed with respect to an instrumentality or activity of the United States Government, it appears that its terms would embrace the conduct of the draft board complained of here. Certainly the existence and mode of operation of a draft board stem directly from a welter of federal statutory authority which governs it; it is inconceivable that the functions of the Selective Service could be carried out, under the current regulatory scheme, without the existence of draft boards such as that complained of here.

In Ferris v. Wilbur, 27 F.2d 262 (4th Cir. 1928), persons owning property near a naval mine depot sued to enjoin the storage of high explosives within their area. The storage of such explosives had been expressly authorized, leading the court to conclude that the suit was attempting to restrain as a nuisance the exercise of discretion reposed

in the executive by a valid act of Congress. The court wrote that,

> But it is unthinkable that the courts should enjoin as a nuisance the use of government property by a co-ordinate branch of the government, the executive, where such use is authorized by a valid act of the other co-ordinate branch, the legislative. It is elementary that courts will not enjoin as a nuisance action authorized by a valid legislative authority. Id. at 264–265. [Citations omitted.]

### III. CONCLUSION

Accordingly, for the reasons stated above, the court finds for defendant herein. The Complaint is hereby dismissed. Judgment for defendant.

The foregoing shall constitute the Findings of Fact and Conclusions of Law required by Rule 52(a) of the Federal Rules of Civil Procedure.

It is so ordered.